UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DERRICK LASHON BRADDOCK,

        Plaintiff,

Case No. 1:10-cv-731

Hon. Gordon J. Quist

v.

ROBERT CROMPTON, *et al.*,

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on defendant Dr. Crompton's "Motion for partial dismissal pursuant to 42 U.S.C. § 1997e(a) and Fed. R. Civ. P. 12(b)(6)" (docket no. 62) and Dr. Crompton's "Motion for partial summary judgment" (docket no. 68),[1] and plaintiff's motion to amend complaint (docket no. 96).

        **I.**        **Plaintiff's claims against Dr. Crompton**

Plaintiff filed a *pro se* complaint against Dr. Crompton and an unknown defendant (later identified as Dr. Haresh Pandya) who was later dismissed. *See*, *infra*. Plaintiff set forth the following allegations. He states he is an "incomplete quadriplegic" and suffers from a left brachial plexopathy injury which results in intense pain from the neck down to the arm. Compl. at ¶¶ 7-9 (docket no. 1). While at the Saginaw Correctional Facility (SRF) in 2004, plaintiff was prescribed

---

[1] Dr. Crompton is represented by two law firms in this matter, each of which filed a dispositive motion. The Juip Richtarcik Law Firm represents Dr. Crompton for incidents which occurred prior to April 1, 2009 (in this case, plaintiff's claim that the doctor discontinued a special accommodation for a TENS unit). The law firm of Chapman and Associates represents Dr. Crompton for incidents which occurred after that date (in this case, plaintiff's claim that the doctor discontinued a Neurontin prescription). If granted, these two motions would resolve all of plaintiff's claims against the doctor.

pain medication (Neurontin, 300mg to 800 mg, three times a day) and a TENS unit for pain relief. *Id.* at ¶¶ 18-19. Plaintiff was later incarcerated at the Carson City Correctional Facility (DRF) in 2008, where his Neurontin dosage was increased to 1000 mg, three times a day. *Id.* at ¶ 20. Later that year, plaintiff was transferred to the Oaks Correctional Facility (ECF). *Id.* at ¶ 21. While at ECF, plaintiff sent a kite to the healthcare department requesting new "plugs" for his TENS unit, which was apparently damaged. *Id.* Plaintiff was called out, took the damaged TENS unit to healthcare, and was given a written authorization to possess the TENS unit "until the new wires/plug came." *Id.* Sometime later, the TENS unit was confiscated by a correctional officer during a cell shakedown. *Id.* A contraband removal slip stated that it was taken due to altered wires. *Id.*

Dr. Crompton, a physician at ECF, discontinued plaintiff's special accommodation for the TENS unit on January 2, 2009, "despite being told by Plaintiff and the nurse who issued the authorization form that Plaintiff had permission to possess the wire/plug [sic]." *Id.* at ¶ 22. Plaintiff also believed that his Neurontin prescription was discontinued "around the month of September or October of 2009." *Id.* at ¶ 23. When plaintiff saw Dr. Crompton on November 23, 2009, he asked why his Neurontin and Antivert (medication for dizziness) were stopped. *Id.* at ¶ 26. In response, Dr. Crompton stated that plaintiff was there for his six month evaluation not "to talk about pain medication," and told plaintiff to "send another kite about that." *Id.* Plaintiff wrote a grievance that day regarding his lack of pain medication. *Id.* at ¶ 27. He also wrote a grievance on December 8, 2009, complaining that the medical service provider (MSP) told him that the medication was stopped due to plaintiff's request. *Id.* at ¶ 31. Plaintiff filed another grievance on December 27, 2009, stating that his pain medication was ordered on December 15, 2009, but that he had not received anything. *Id.* at ¶ 33.

Plaintiff sent a healthcare kite on January 3, 2010, requesting Neurontin for his pain. *Id.* at ¶ 35. Plaintiff sent another healthcare kite about the Neurontin on January 8, 2010, and was advised by a nurse that the Regional Medical Officer (RMO) did not re-instate the Neurontin order, but ordered Tegretol (sometimes referred to as "Tegretal") on December 15, 2009. *Id.* at ¶ 36. Plaintiff sent another healthcare kite on January 19, 2010 complaining about arm pain, and was scheduled for an appointment. *Id.* at ¶ 37. Dr. Crompton saw plaintiff on January 22, 2010, but would discuss only the "medication for dizziness" (i.e., Antivert) and told plaintiff to write another kite about the pain medication (i.e., Neurontin). *Id.* at ¶ 41. Plaintiff sent a kite to healthcare on January 24, 2010, and was scheduled to see a different doctor about the pain medication. *Id.* at ¶ 42. Plaintiff sent another kite on February 23, 2010 complaining that his current medication did not work for his left arm pain and requested to see a doctor. *Id.* at ¶ 44. Plaintiff saw Nurse Practitioner (NP) Eipperle on March 3, 2010, complaining that the Tegretol was not controlling his pain. *Id.* at ¶ 45. NP Eipperle told plaintiff that the pain committee had denied her request for Neurontin, became irate and told plaintiff to give the Tegretol time to "kick in." *Id.* at ¶ 45.

Plaintiff subsequently served both Dr. Crompton and NP Eipperle with an admittedly defective "Notice of Intent" to sue under state law (i.e., it lacked an "Affidavit of Merit" for a medical malpractice claim), so that the doctor would "act and take his pain problem serious [sic]." *Id.* at ¶ 46. Plaintiff was transferred to Mound Correctional Facility (NRF) on April 24, 2010. *Id.* at ¶ 47. While at NRF, another physician, Dr. Ramesh, stated that "[t]he Pain Committee never stopped your neurontin medication and that Nurse Practitioner Eipperle requested approval for neurontin and was e-mailed back stating that Plaintiff was reapproved for neurontin by the Pain Committee in 2008, so there was no need to request again." *Id.* Plaintiff heard Dr. Ramesh tell

3

"higher personnel" on the telephone that "somebody interfered with Plaintiff [sic] pain medication for no reason and he didn't understand why." *Id.* Dr. Ramesh then ordered plaintiff to receive 30 mg of Neurontin, three times per day. *Id.* at ¶ 48.

Plaintiff alleged that Dr. Crompton violated his Eighth Amendment rights by: deliberately stopping his pain medication (Neurontin) when the doctor knew that plaintiff's brachial plexus injury was being treated by that medication; ordering a pain medication that the doctor knew was ineffective (Tegretol) and which conflicted with plaintiff's other medications; and discontinued plaintiff's special accommodation for a TENS unit. *Id.* at ¶ 52. Plaintiff's claims against Dr. Pandya were terminated on August 3, 2011, when the court dismissed Dr. Pandya with prejudice pursuant to the parties' stipulation. *See* Stipulation and order of dismissal (docket no. 71). Accordingly, Dr. Crompton is the sole remaining defendant in this action.

**II.     Dr. Crompton's motion for partial dismissal (docket no. 62)**

**A.     Legal Standard**

Dr. Crompton seeks to dismiss plaintiff's claim regarding the discontinuation of the TENS unit pursuant to Fed. R. Civ. P. 12(b)(6).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, -- U.S. --, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted). In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12

4

(6th Cir. 1987). "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

Here, plaintiff filed a combined response to the motion for partial dismissal and the motion for partial summary judgment. *See* Response (docket no. 79). Plaintiff's response included 106 pages of exhibits, relating to his claims against Dr. Crompton. *See* Plaintiff's Response Brief (docket no. 80). Dr. Crompton did not seek to strike these exhibits. On the contrary, he relied upon some of plaintiff's exhibits in his reply to the motion for partial dismissal. *See* Defendant's Reply (docket no. 88). Under the circumstances, the motion for partial dismissal must now be treated as one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56"). Given that Dr. Crompton's reply relied (at least in part) on documentation submitted by plaintiff, the court concludes that the doctor had a reasonable opportunity to present all the material pertinent to his motion. *See id.* ("All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion"). Accordingly, the court will review Dr. Crompton's motion for partial dismissal as one for partial summary judgment.

### B. Legal standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

5

Fed. R. Civ. P. 56(a).  Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### C. Failure to exhaust

### 1. Exhaustion requirement

The Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' " *Jones*, 549 U.S. at 218.

### 2. Michigan Department of Corrections' grievance process

The Michigan Department of Corrections (MDOC) requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues shall be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why,

7

> how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. Plaintiff failed to properly exhaust a grievance with respect to the TENS unit

As an initial matter, defendant points out that none of the grievances attached to plaintiff's complaint (Exhibits J, L, N and R) (docket nos. 1-10, 1-12, 1-14 and 1-18) refer to the discontinuation of the TENS unit in January 2009. *See* Defendant's Brief at pp. 4-7 (docket no. 62). By initially relying on the grievances attached to plaintiff's complaint and response, defendant shifted the burden of proof for exhaustion to plaintiff, reminiscent of past practices that have been disapproved by the Supreme Court. *See Jones*, 549 U.S. at 216 ("[w]e conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints"). In his response to the motion, plaintiff produced a copy of a grievance regarding the TENS Unit, Grievance No. ECF-09-01-0066-12D1 ("66"), which he claims exhausted that issue. *See* Grievance 66 (docket no. 80-1 at pp. 8-12). In this grievance, plaintiff stated an incident date of January 7, 2009, and complains that a corrections officer took the TENS unit because of an altered wire, *id.,* and asks for the TENS unit to be returned. This grievance appears to contest the actions of an unnamed corrections officer for taking the altered

8

TENS unit. Dr. Crompton is not named in the grievance, and the only reference to a medical provider is plaintiff's confusing statement that

> I'm in more pain without doctors [sic] order to discontinue my TENS unit and keep my unit that I own and not the state, this came from the outside doctors care. I respectfully requests [sic] that my TENS unit be given back.

Grievance 66.

This grievance, upon which plaintiff relies on as the basis of his claim, does not name Dr. Crompton. *Id.* Even if it did, the grievance does not contest a doctor's medical treatment. At most, it notes that plaintiff's TENS unit was confiscated by a corrections officer. Plaintiff exhausted Grievance 66 through step III. *Id.* In his reply to plaintiff's answer, defendant relies on Grievance 66 to demonstrate lack of proper exhaustion. *See* Defendant's Reply at pp. 1-3 (docket no. 88). Both parties having addressed the issue of exhaustion, and both parties having relied on a matter outside the pleadings, to wit, Grievance 66, defendant's motion will be treated as one for summary judgment, FRCP 12(d).

Here, Dr. Crompton has shown that the grievance upon which plaintiff relies (Grievance 66) does not demonstrate exhaustion of the TENS unit claim. *See* Fed. R. Civ. P. 56(c)(1)(B), "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Viewing the evidence in the light most favorable to plaintiff, the court concludes that Grievance 66 was not properly exhausted under the PLRA. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, Dr. Crompton is entitled to summary judgment on this claim for lack of exhaustion.

### D. The Eighth Amendment claim arising from the TENS unit

In the alternative, Dr. Crompton has moved to dismiss plaintiff's Eighth Amendment claim regarding the discontinuation of the TENS unit for failure to state a claim for relief. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of

life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. The conduct for which Eighth Amendment liability attaches must be more than negligence, "it must demonstrate deliberateness tantamount to an intent to punish." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (internal citation omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Plaintiff relies on the allegations in his verified complaint and other records.[2] Plaintiff alleged that Dr. Crompton discontinued the special accommodation for the TENS unit on January 2, 2009, that the TENS unit was damaged and that corrections officers confiscated the

---

[2] The court notes that a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993).

damaged unit during a cell shakedown. Compl. at ¶¶ 20-21. At most, plaintiff's complaint has alleged a disagreement with Dr. Crompton regarding his need to keep a damaged TENS unit.

Furthermore, plaintiff was not deprived of medical treatment in violation of the Eighth Amendment due to the confiscation of his broken TENS unit. Plaintiff has submitted a medical record which reflects that he requested "TENS supplies" on October 26, 2008. *See* Kite (docket no. 80-1 at p. 6). In response to this kite, healthcare advised plaintiff to bring in his TENS unit and electrodes wires and electrodes so they could try to match his unit. *Id.* While plaintiff alleges that the TENS unit was eliminated in January 2009, plaintiff alleges in the complaint that he remained on pain medication (Neurontin) until at least September or October 2009. Compl. at ¶ 23. This is reflected in medical records submitted by plaintiff and in his declaration that he received Neurontin both before and after his incarceration. *See* MDOC Chronic Care Clinic record (Oct. 9, 2009) (docket no. 80-1 at pp. 19-21); Braddock Decl. at ¶ 4 (docket no. 80-1 at p. 14). *See also*, discussion regarding pain medication prescribed in § III, *infra*. In addition, plaintiff alleged that he was given a variety of other medications to control his pain, including Tylenol #4, Vicodin, Darvocet, Demorol, MS Contin (morphine) and Zonegran. *Id.* at ¶ 60. In short, both the allegations in the complaint and the evidence submitted by the parties reflect that plaintiff received pain medication both before and after Dr. Crompton eliminated the special accommodation of the TENS unit in January 2009.

This is not a case where a prisoner was denied pain medication. The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). This action falls in the latter category. "Where

a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* Furthermore, the gist of plaintiff's complaint was a disagreement with Dr. Crompton regarding the scope of his pain treatment and plaintiff's desire to keep a damaged TENS unit. An Eighth Amendment claim will not arise from this type of disagreement between a prisoner and a prison physician. *See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). *See also*, *Woodberry v. Simmons*, 146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"). Accordingly, Dr. Crompton's motion to dismiss plaintiff's claim of deliberate indifference for discontinuing the TENS unit should be granted.

### III. Dr. Crompton's motion for partial summary judgment (docket no. 68)

In his remaining claims, plaintiff alleged that Dr. Crompton deliberately terminated plaintiff's prescription for one pain medication (Neurontin) and ordered a different pain medication that the doctor knew was ineffective (Tegretol). *See* Compl. at ¶ 52.A. and D. Dr. Crompton's other counsel has moved for summary judgment with respect to plaintiff's claims arising from the discontinuance of his Neurontin prescription. It is undisputed that Dr. Crompton terminated plaintiff's Neurontin prescription. *See* Dr. Robert Crompton Aff. at ¶ 4 (docket no. 68-2). The medical record reflects that this arose from plaintiff's request. On November 4, 2009, plaintiff advised RN Briske that he did not want Neurontin, just Antivert for dizziness. Plaintiff's Medical

Records at p. 93 (docket no. 70). Plaintiff, who was ambulating with a cane, advised the nurse that he had turned in his wheelchair and that Antivert was the only thing that was keeping him from falling down due to dizziness. *Id.* Later that date, Dr. Crompton discontinued the Neurontin per plaintiff's request. *Id.* at p. 94. Plaintiff contacted Health Service on November 4th, 12th, 16th and 18th. While he inquired about the termination of prescriptions for Antivert and Elavil, he did not inquire about the termination of his Neurontin prescription. *Id.* at pp. 94-99, 101. Dr. Crompton examined plaintiff on November 20th, at which time plaintiff asked why the Antivert was discontinued and wanted to have it re-started. *Id.* at p. 102. Later than day, plaintiff met with RN Forrest and noted that he had constant pain in his left arm for the past three weeks since the Neurontin was discontinued. *Id.* at pp. 103-06.

On November 23rd, plaintiff complained to NP Eipperle that Dr. Crompton had discontinued his Neurontin. *Id.* at p. 109. Medical records reflect that it was discontinued "by client request." *Id.* On November 30th, plaintiff advised RN Monroe that he would like the Neurontin back, because his nerves were "going crazy" in the cold weather. *Id.* at p. 112. Plaintiff was scheduled for an examination with a medical provider to re-evaluate his pain. *Id.* NP Eipperle saw plaintiff for pain management on December 8, 2009, at which time he told Eipperle that he was misunderstood and misquoted with respect to the Neurontin and did not want the Neurontin discontinued. *Id.* at p. 116. NP Eipperle and Dr. Crompton requested that the MDOC's RMO re-start the Neurontin. *Id.* at 117, 119. The RMO deferred a decision for dispensing Neurontin liquid, noting that plaintiff's prior prescription for three Neurontin 300 mg tabs dissolved in water had been approved in 2008 and that no further approval was necessary. *Id.* On December 15, 2009, after

reviewing the RMO's notes, NP Eipperle chose to dispense an alternative medication, Tegretol. *Id.* at p. 121; Crompton Aff. at ¶ 10.

On January 22, 2010, plaintiff met with Dr. Crompton regarding a steroid injection for his right hip. Plaintiff's Medical Records at p. 130. On January 27, 2010, plaintiff saw NP Eipperle concerning his pain. *Id.* at p. 132. While plaintiff wanted the Neurontin re-started, Eipperle continued with the Tegretol, explaining that compliance is needed for long term effectiveness. *Id.* On January 29th, Dr. Crompton administered another steroid injection for pain treatment. *Id.* at p. 133. On March 22nd, the doctor saw plaintiff at a chronic care clinic examination. *Id.* at p. 158. At that time, the following "active" medications were listed in plaintiff's records: Antivert; Tylenol; Nozoal; Baclofen; Zocor; and Tegretol. *Id.* Plaintiff was transferred to Michigan Reformatory (RMI) on or about April 23, 2010. *Id.* at p. 165.

In his affidavit in opposition, plaintiff denied that on November 4, 2009, he told Nurse Briske to discontinue the Neurontin ("[a]t no time did I ever tell, or state to Nurse Briske that I did not want no Neurontin"). Braddock Aff. at ¶ 10 (docket no. 80-1 at p. 14). Plaintiff also stated that during the November 20th examination with Dr. Crompton, he "tried to talk to Dr. Crompton about my Neurontin medication" but the doctor told him to send another kite about it. *Id.* at ¶ 12. Plaintiff also stated that he raised the issue of the Neurontin with Dr. Crompton on three other occasions (January 22nd, January 29th, and March 22nd, 2010). *Id.* at ¶¶ 13-15. On January 22nd and 29th, the doctor told plaintiff "to send a kite" about the Neurontin. *Id.* at ¶¶ 13-14. On March 22nd, the doctor told plaintiff that he "wasn't getting it." *Id.* at ¶ 15.

Viewing the facts in the light most favorable to plaintiff, the court concludes that plaintiff has failed to demonstrate an Eighth Amendment claim against Dr. Crompton. The records

15

reflect that the doctor discontinued the Neurontin on plaintiff's request as reflected in the MDOC's medical records. Assuming plaintiff's version of the facts, i.e., that Nurse Briske misunderstood plaintiff's instructions and incorrectly documented plaintiff's request to be taken off Neurontin, the instruction was in the record and it is undisputed that Dr. Crompton and NP Eipperle relied on that record to discontinue that pain medication. There is no evidence that the doctor had the subjective intent to punish or injure plaintiff by discontinuing the Neurontin. At most, there was an error in transcribing plaintiff's records which led to the discontinuation. Assuming that plaintiff requested Dr. Crompton prescribe Neurontin in January and March, 2010, the doctor's refusal to do so would not amount to deliberate indifference. At that time, plaintiff's pain was being managed by NP Eipperle with a different medication, Tegretol. Furthermore, plaintiff has not met the objective requirement for an Eighth Amendment claim. Plaintiff received continuous medical treatment for his pain. This court should not second guess the medical judgment of Dr. Crompton and NP Eipperle regarding the type of pain medication being administered and constitutionalize claims which, at most, sound in state tort law. *See Westlake*, 537 F.2d at 860 n. 5. Dr. Crompton is entitled to summary judgment on plaintiff's claim regarding the termination of his Neurontin prescription.

### IV. Plaintiff's motion to amend (docket no. 96)

Plaintiff has recently moved to amend his complaint to add NP Eipperle as a defendant. Fed. R. Civ. P. 15(a)(2) provides that a party may amend its pleading only with the court's leave and that "[t]he court should freely give leave when justice so requires." While the court should freely grant amendments, the court may deny a plaintiff's leave to amend his or her complaint "when the proposed amendment would be futile." *See Kottmyer v. Maas*, 436 F.3d 684,

16

692 (6th Cir. 2006). Here, plaintiff seeks to add NP Eipperle as a defendant in this action for failing to provide Neurontin. *See* Motion to amend at ¶ 4. Plaintiff has based this claim on the facts as alleged in the original complaint. *Id.* at ¶¶ 4-6. The record developed with respect to Dr. Crompton's motion for summary judgment reflects that plaintiff's failure to receive Neurontin was, at most, the result of a transcription error in the medical records. Furthermore, it is undisputed that plaintiff received continuous medical treatment for his pain. As with plaintiff's claims against Dr. Crompton, this court should not constitutionalize claims against NP Eipperle which, again, appear to be no more than state tort claims. *See Westlake*, 537 F.2d at 860 n. 5. Accordingly, plaintiff's motion to amend should be denied.

### V.     Recommendation

For the reasons set forth above, I respectfully recommend that Dr. Crompton's motion for partial dismissal (docket no. 62) and his motion for partial summary judgment (docket no. 68) be **GRANTED** and that he be **DISMISSED** from this action.

I further recommend that plaintiff's motion to amend (docket no. 96) be **DENIED**.

I further recommend that this action be **TERMINATED**.


Dated:  February 9, 2012                       /s/ Hugh W. Brenneman, Jr.
                                               HUGH W. BRENNEMAN, JR.
                                               United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).