UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DERRICK LASHON BRADDOCK,

Plaintiff,

Case No. 1:10-cv-731

Hon. Gordon J. Quist

v.

ROBERT CROMPTON, *et al.*,

Defendants.
_______________________________/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on defendants Robert Crompton, M.D. and Marilyn Eipperle, NP's motion for summary judgment (docket no. 176).

**I. Background**

Plaintiff filed a *pro se* complaint on July 28, 2010. This Court previously summarized his allegations as follows:

> [Plaintiff] states he is an "incomplete quadriplegic" and suffers from a left brachial plexopathy injury which results in intense pain from the neck down to the arm. Compl. at ¶¶ 7-9 (docket no. 1). While at the Saginaw Correctional Facility (SRF) in 2004, plaintiff was prescribed pain medication (Neurontin, 300mg to 800 mg, three times a day) and a TENS unit for pain relief. *Id.* at ¶¶ 18-19. Plaintiff was later incarcerated at the Carson City Correctional Facility (DRF) in 2008, where his Neurontin dosage was increased to 1000 mg, three times a day. *Id.* at ¶ 20. Later that year, plaintiff was transferred to the Oaks Correctional Facility (ECF). *Id.* at ¶ 21. While at ECF, plaintiff sent a kite to the healthcare department requesting new "plugs" for his TENS unit, which was apparently damaged. *Id.* Plaintiff was called out, took the damaged TENS unit to healthcare, and was given a written authorization to possess the TENS unit "until the new wires/plug came." *Id.* Sometime later, the TENS unit was confiscated by a correctional officer during a cell shakedown. *Id.* A contraband removal slip stated that it was taken due to altered wires. *Id.*

Dr. Crompton, a physician at ECF, discontinued plaintiff's special accommodation for the TENS unit on January 2, 2009, "despite being told by Plaintiff and the nurse who issued the authorization form that Plaintiff had permission to possess the wire/plug [sic]." *Id.* at ¶ 22. Plaintiff also believed that his Neurontin prescription was discontinued "around the month of September or October of 2009." *Id.* at ¶ 23. When plaintiff saw Dr. Crompton on November 23, 2009, he asked why his Neurontin and Antivert (medication for dizziness) were stopped. *Id.* at ¶ 26. In response, Dr. Crompton stated that plaintiff was there for his six month evaluation not "to talk about pain medication," and told plaintiff to "send another kite about that." *Id.* Plaintiff wrote a grievance that day regarding his lack of pain medication. *Id.* at ¶ 27. He also wrote a grievance on December 8, 2009, complaining that the medical service provider (MSP) told him that the medication was stopped due to plaintiff's request. *Id.* at ¶ 31. Plaintiff filed another grievance on December 27, 2009, stating that his pain medication was ordered on December 15, 2009, but that he had not received anything. *Id.* at ¶ 33.

Plaintiff sent a healthcare kite on January 3, 2010, requesting Neurontin for his pain. *Id.* at ¶ 35. Plaintiff sent another healthcare kite about the Neurontin on January 8, 2010, and was advised by a nurse that the Regional Medical Officer (RMO) did not re-instate the Neurontin order, but ordered Tegretol (sometimes referred to as "Tegretal") on December 15, 2009. *Id.* at ¶ 36. Plaintiff sent another healthcare kite on January 19, 2010 complaining about arm pain, and was scheduled for an appointment. *Id.* at ¶ 37. Dr. Crompton saw plaintiff on January 22, 2010, but would discuss only the "medication for dizziness" (i.e., Antivert) and told plaintiff to write another kite about the pain medication (i.e., Neurontin). *Id.* at ¶ 41. Plaintiff sent a kite to healthcare on January 24, 2010, and was scheduled to see a different doctor about the pain medication. *Id.* at ¶ 42. Plaintiff sent another kite on February 23, 2010 complaining that his current medication did not work for his left arm pain and requested to see a doctor. *Id.* at ¶ 44. Plaintiff saw Nurse Practitioner (NP) Eipperle on March 3, 2010, complaining that the Tegretol was not controlling his pain. *Id.* at ¶ 45. NP Eipperle told plaintiff that the pain committee had denied her request for Neurontin, became irate and told plaintiff to give the Tegretol time to "kick in." *Id.* at ¶ 45.

Plaintiff subsequently served both Dr. Crompton and NP Eipperle with an admittedly defective "Notice of Intent" to sue under state law (i.e., it lacked an "Affidavit of Merit" for a medical malpractice claim), so that the doctor would "act and take his pain problem serious [sic]." *Id.* at ¶ 46. Plaintiff was transferred to Mound Correctional Facility (NRF) on April 24, 2010. *Id.* at ¶ 47. While at NRF, another physician, Dr. Ramesh, stated that "[t]he Pain Committee never stopped your neurontin medication and that Nurse Practitioner Eipperle requested approval for neurontin and was e-mailed back stating that Plaintiff was reapproved for neurontin by the Pain Committee in 2008, so there was no need to request again." *Id.* Plaintiff

> heard Dr. Ramesh tell "higher personnel" on the telephone that "somebody interfered with Plaintiff [sic] pain medication for no reason and he didn't understand why." *Id.* Dr. Ramesh then ordered plaintiff to receive 30 mg of Neurontin, three times per day. *Id.* at ¶ 48.
>
> Plaintiff alleged that Dr. Crompton violated his Eighth Amendment rights by: deliberately stopping his pain medication (Neurontin)when the doctor knew that plaintiff's brachial plexus injury was being treated by that medication; ordering a pain medication that the doctor knew was ineffective (Tegretol) and which conflicted with plaintiff's other medications; and discontinued plaintiff's special accommodation for a TENS unit. *Id.* at ¶ 52. Plaintiff's claims against Dr. Pandya were terminated on August 3, 2011, when the court dismissed Dr. Pandya with prejudice pursuant to the parties' stipulation. *See* Stipulation and order of dismissal (docket no. 71). Accordingly, Dr. Crompton is the sole remaining defendant in this action.

Report and Recommendation at pp. 1-5 (docket no. 104).

In his complaint, plaintiff stated that his claims against Dr. Crompton arose under the Eighth Amendment and 28 U.S.C. § 1983, an unspecified section of "The Michigan Constitution of 1963" and M.C.L. § 691.1407 ("Governmental immunity from tort liability"). Compl. at ¶ 51. With respect to the alleged state statutory violation, plaintiff paraphrased the definition of "gross negligence" as set forth in M.C.L. § 691.1407, stating that Dr. Crompton's "conduct was so reckless as to demonstrate a substantial lack of concern for whether injuries result."

On March 18, 2011, plaintiff filed a *pro se* motion to amend the complaint to include two additional defendants, Nurse Practitioner (NP) Marilyn Eipperle and Nurse Addie Briske. *See* Motion to amend (docket no. 33). On June 13, 2011, plaintiff filed another *pro se* motion to amend the complaint, asking permission "to add two new parties to his complaint." *See* Motion to amend (docket no. 57). The Court denied both motions as improperly filed under the local court rules. *See* Order (docket no. 93).

On January 11, 2012, plaintiff filed another *pro se* motion to amend the complaint. *See* Motion to amend (docket no. 96). In this motion, plaintiff sought to add NP Eipperle as a defendant stating: that he saw NP Eipperle on November 23, 2009 and December 8, 2009 complaining about pain in his left arm and hand; that she refused to provide plaintiff with Neurontin; that she was informed by the Regional Medical Officer (former defendant Dr. Pandya) that she did not need approval from the pain management committee for the Neurontin; that she "engaged in deceit and intentionally interfered with the treatment once prescribed by other doctors by refusing to give Plaintiff his pain medication"; and that she "informed Nurses Monroe and Dumas that the Regional Medical Officer did not reapproved [sic] Plaintiff Neurontin medication, which was completely false." *Id.* The proposed amendment referenced in the January 11, 2012 motion was limited to a federal claim against NP Eipperle, i.e., "Plaintiff respectfully request [sic] that This Court allow him to add Nurse Practitioner Eipperler [sic] as a defendant, because she was directly involved in violating Plaintiff's Eighth Amendment rights." *Id.*

For his part, defendant Dr Crompton filed motions for partial dismissal (docket no. 62) and for partial summary judgment (docket no. 68). Magistrate Judge Hugh W. Brenneman, Jr., recommended granting Dr. Crompton's dispositive motions and denying plaintiff's motion to amend the complaint as futile. *See* Report and Recommendation (docket no. 104). The district judge adopted the recommendations and dismissed the case. *See* Memorandum Opinion and Order (docket no. 109) and Judgment (docket no. 110).

Plaintiff appealed this Court's judgment to the Sixth Circuit, which entered an order reversing the judgment and remanding the action. In reaching this determination, the Sixth Circuit summarized plaintiff's claim as follows:

> Braddock filed this lawsuit against Dr. Robert Crompton, a physician at the Oaks Correctional Facility, and Dr. Haresh Pandya, the Regional Medical Officer ("RMO") of that facility, who was subsequently dismissed pursuant to the parties' joint stipulation. Braddock, who suffers from chronic pain in his left arm resulting from a gunshot wound, claimed that Crompton violated his Eighth Amendment rights by discontinuing his transcutaneous electrical nerve stimulation ("TENS") unit and by discontinuing his pain medication, Neurontin, and replacing it with another medication, Tegretol, which was ineffective and interfered with his other medications.

*Braddock v. Crompton*, No. 12-1354, slip op. at p. 1 (March 15, 2013) (docket no. 116).

Then, the Sixth Circuit found that plaintiff had provided sufficient evidence which, when viewed in his favor, could support an Eighth Amendment claim against Dr. Crompton:

> Braddock has presented evidence from which a jury could find that Crompton acted with deliberate indifference by failing to reinstate Braddock's Neurontin prescription. According to Crompton, his decision to discontinue the Neurontin was based on a request that Braddock made to a prison nurse on November 4, 2009. As Braddock points out, however, the prison policy guidelines regarding treatment for chronic care provide that a medical practitioner "must have a face-to-face encounter with [a] prisoner before discontinuing a medication." Although the failure to follow prison policies does not establish a constitutional violation, "disregard of prison protocols" may support a finding of a sufficiently culpable state of mind in denying appropriate medical care. *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008); *see* [*Comstock v. McCrary*, 273 F.3d 693, 709 (6th Cir. 2001)]. More significantly, even after Braddock complained that he was in severe pain and wanted to reinstate his Neurontin, Crompton failed to do so. Crompton explains his decision in part by asserting that Braddock did not ask for Neurontin at his visit on November 20, 2009. Braddock, however, asserts that he tried to discuss his Neurontin prescription with Crompton at this visit, but Crompton refused. This assertion is supported by other evidence in the record and in any event must be viewed as true at the summary judgment stage. *See Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 841 (6th Cir. 2002). Crompton also argues that Tegretol is "a reasonable and effective alternative medication to Neurontin." But the Tegretol did not alleviate Braddock's pain, whereas Neurontin, which Braddock had been taking for several years, had already proven effective and been approved by the prison's pain management committee. Because a reasonable jury could find that Crompton disregarded a risk of serious harm when he failed to reinstate Braddock's Neurontin prescription despite knowing that Braddock was in severe pain, summary judgment was not appropriate. *See, e.g., McCarthy v. Place*, 313 F. App'x 810, 815-16 (6th Cir. 2008); *Terrance*, 286 F.3d at 844-46.

*Id.*, slip op. at pp. 2-3.

The Sixth Circuit also addressed this Court's denial of plaintiff's motion to amend his complaint to add NP Eipperle as a defendant:

> Braddock also challenges the district court's denial of his motion to amend his complaint to add Eipperle as a defendant. Although we ordinarily review the denial of a motion to amend for an abuse of discretion, we review de novo a district court's determination that amendment would be futile. *Brown v. Cassens Transp. Co.*, 675 F.3d 946, 953 (6th Cir. 2012), *petition for cert. filed*, 81 U.S.L.W. 3293 (Nov. 16, 2012) (No. 12-622); *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002).
>
> Because a jury could find that the continued refusal to reinstate Braddock's Neurontin prescription constituted deliberate indifference, amending the complaint to add Eipperle, who played a greater role in treating Braddock than Crompton did, would not have been futile. Accordingly, the motion to amend should not have been denied on this basis. On remand, the district court should determine whether justice requires allowing Braddock leave to amend his complaint. *See id.* at 968 ("Courts should 'freely give leave [to amend a complaint] when justice so requires.'" (quoting Fed. R. Civ. P. 15(a))).

*Id.*, slip op. at pp. 3-4.

On remand, this Court appointed Attorney Daniel E. Manville of the Michigan State University College of Law, Civil Rights Clinic, as plaintiff's counsel. *See* Order Appointing Counsel (docket no. 123). Attorney Manville filed a second amended complaint which set forth Eighth Amendment claims against Dr. Crompton and NP Eipperle:

> 83. Defendant Crompton violated Plaintiff's Eighth Amendment right when he deliberately stopped Plaintiff's pain medication (Neurontin) when he knew that Plaintiff suffered from a brachial plexus injury that was being treated by medication to control Plaintiff's chronic pain and knew at all times of the medical documents illustrating the severity of the injury; and ordering a pain medication that the doctor knew was ineffective (Tegretol) and which conflicted with Plaintiff [sic] other pain medication.
>
> 84. Defendant Eipperle violated Plaintiff's Eighth Amendment right not to be subjected to deliberate indifference as to receiving medical care when she interfered

> in Plaintiff receipt of Neurontin; when she did not reinstate the Neurontin when informed by Dr. Pandya that the Pain Management Committee did not discontinue that medication; when she falsified medical records resulting in Plaintiff not receiving proper medical care; and she interfered with a prescribed course of treatment.

*See* Second Amend. Compl. (docket no. 152 at p. ID# 1201).

While the Sixth Circuit's decision involved plaintiff's interaction with Dr. Crompton on only two dates, November 4 and 20, 2009, the second amended complaint included additional allegations that plaintiff interacted with the doctor on January 2 and 29, 2010, and March 22, 2010. Second Amend. Comp. at ¶¶ 55, 61 and 68 (pp. ID## 1198-1200). In addition, plaintiff alleged that he interacted with NP Eipperle on November 23, 2009, December 8, 2009, January 27, 2010, and "March 2 or 3, 2010." *Id.* at ¶¶ 30, 37, 57, 63 (pp. ID## 1195-96, 1199). Plaintiff seeks compensatory damages against both defendants.

**II. Legal standard for summary judgment**

Defendants seek summary judgment on two grounds. First, defendants contend that plaintiff failed to properly exhaust his administrative remedies. Second, defendants contend that plaintiff cannot establish an Eighth Amendment claim against them. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. Exhaustion of administrative remedies

### A. Legal standard

The Prison Litigation Reform Act (PLRA) provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to

obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

**B. MDOC Grievance process**

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

**C. Plaintiff's grievances**

**1. Overview**

Defendants contend that plaintiff failed to properly exhaust his claims based on the grievances attached to the original complaint. Defendants' review is somewhat cursory in that they do not identify the grievances by number. Defendants' Brief (docket no. 176 at pp. ID## 1290-92). Defendants have identified three grievances, Grievance no. ECF 09-11-3968-12f ("3968"), Grievance no. ECF 09-12-5006-12f ("5006"), and Grievance no. ECF 10-01-0014-12e ("14"). *Id.*

Grievance no. 3968 involved an incident on November 23, 2009, and was based upon plaintiff's "pain medication being stopped." *See* Grievance no. 3968 (docket no. 1-10 at p. ID#47. Plaintiff did not grieve any particular person or identify who stopped the pain medication. *Id.* In the section of grievance regarding attempts to resolve the issue prior to filing the grievance, plaintiff stated "I was seen by the doctor and MSP [medical service provider] and complained of my left arm pain and wasn't given a reason why my pain medication was stopped." *Id.* Plaintiff signed off on November 30, 2009, stating that the matter had been resolved at Step I. *Id.*

Grievance no. 5006 involved an incident on December 8, 2009. *See* Grievance no. 5006 (docket no. 1-12 at p. ID# 51). In the grievance, plaintiff stated that he saw the MSP on

December 8, 2009 and "was told by the MSP that my pain medication was stopped because I requested it to be stopped." *Id.* Plaintiff stated that "I informed the nurse to stop my Advils, at no time did I requested [sic] that my Nertouins [sic] be stopped." *Id.* Plaintiff further stated that "ECF doctor and MSP are refusing to issue my medication because a nurse asked for the medication to be stopped without consulting me first." *Id.* An undated Step I response stated as follows:

> Grievant states he asked the nurse to discontinue his Advil but his Neurontin was discontinued instead.
>
> The Neurontin was re ordered 12/15/09.

Step I response (docket no. 1-13 at p. ID# 53). On December 17, 2009, plaintiff signed off on the grievance, stating that the matter had been resolved at Step I. Grievance no. 5006 at p. ID# 51.

Grievance no. 14 involved an incident on December 15, 2009. *See* Grievance no. 14 (docket no. 1-14 at p. ID# 55). Plaintiff did not name anyone in this grievance, in which he complained that "my pain medication was order [sic] on 12-15-09 and I have not received anything." *Id.* Plaintiff stated that he attempted to resolve the issue on December 21, 2009, but did not state his efforts other than to state "I wrote healthcare kite asking when I would receive my pain medication, no response." *Id.* In the step I response, the MDOC noted that "[t]here is no evidence that an attempt has been made to resolve the issue presented" in accordance with Policy Directive 03.02.130. Step I response (docket no. 1-14 at p. ID# 56). However, the MDOC did not reject the grievance for failing to comply with the policy directive. Rather, the MDOC responded to the grievance as follows:

> Grievant states he had pain meds ordered but had not yet received them. He also states he needs Neurontin for pain.

> He is advised the request for Neurontin was denied by the Regional Medical Officer, therefore it cannot be provided. Tegretol was ordered for pain on 12/15/09. It arrived 12/16/09 and is nurse administered.

*Id.* The record reflects that plaintiff exhausted Grievance no. 14. *See* Grievance no. 14 (Step II appeal, Step II response, Step III response) (docket nos. 1-18 at p. ID# 65, 1-19 at p. ID# 67, and 1-20 at p. ID# 69).[1]

**2. Grievance nos. 3968 and 6005**

Defendants contend that grievances 3968 and 6005 are unexhausted because the grievances were resolved at Step I and plaintiff failed to name defendants as required by Policy Directive 03.02.130 ¶ R. Under the facts of this case, the Court concludes that these two grievances were properly exhausted. Defendants point out that plaintiff did not name them in these grievances as required by Policy Directive 03.02.130, which "specifically requires the grievance to include the dates, times, places, and *names of all those involved in the issue being aggrieved*." *Hall v. Warren*, 443 Fed. Appx. 99, 106 (6th Cir. 2011) (emphasis in original). Thus, a grievance is not properly exhausted where it fails to name the defendant doctor or "any other medical official." *Id.* While the MDOC could have rejected the grievance on this basis, it chose to overlook the procedural deficiency and addressed it on the merits. "When prison officials decline to enforce their own procedural requirements and opt to consider otherwise - defaulted claims on the merits, so as a general rule will we." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010). "[T]he State's decision to review a claim on the merits gives us a warrant to do so as well, even when a procedural default might otherwise have resolved the claim." *Id.*

[1] The Court notes that defendants may have confused the Step II response as a fourth grievance. *See* Defendants' Brief at p. ID# 1291.

Here, the MDOC's respondent and reviewer had sufficient information to identify the medical personnel at issue because they resolved the grievance. "Where a prisoner has received the relief he requested in his grievance, he has no basis for appealing his grievance to another step." *Grear v. Gelabert*, No. 1:07-CV-203, 2008 WL 474098 at *10 (W.D. Mich. Feb. 15, 2008). In reaching this determination, the Court noted that under former Policy Directive 03.02.130 (CC) and (GG), " 'If a grievant is dissatisfied with the response received at [the previous] Step [ ] or does not receive a timely response' s/he may appeal to the next step)". *Id.* The current version of Policy Directive 03.02.130 includes similar language. *See* Policy Directive 03.02.130 (eff. July 9, 2007) (providing in ¶ BB that "[a] grievant may file a Step II grievance if s/he is dissatisfied with the response received at Step I or if s/he did not receive a timely response" and in ¶ FF that "[a] grievant may file a Step III grievance if s/he is dissatisfied with the Step II response or does not receive a timely response"). *Cf. Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) ("it would be counterintuitive to require inmates who win during the grievance process to appeal their victories").

That being said, issues of fact exist as to whether this grievance addressed plaintiff's claims against Dr. Crompton on either November 4, 2009 or November 20, 2009. Plaintiff did not interact with Dr. Crompton on November 4, 2009. Treatment records reflect that at 12:26 p.m., plaintiff met with RN Addie Briske, and told her: "I don't want that Neurontin - just the Antivert. That's All." *See* Treatment Note (docket no. 178-1 at pp. ID# 1651). Later that day, at 4:43 p.m., Dr. Crompton entered a progress note stating, "Neurontin d/c'd per Pt request." *Id.* at p. ID# 1662. Plaintiff did interact with Dr. Crompton on November 20, 2009. On that date, according to the doctor's notes, plaintiff questioned why his antivert was stopped, telling the doctor that his walking was unsteady and that he wanted the prescription restarted. *Id.* at p. ID# 1660. As discussed, the

Sixth Circuit noted, a question of fact exists as to whether Dr. Crompton refused to discussing plaintiff's neurontin prescription on that date. *See Braddock*, No. 12-1354, slip op. at pp. 2-3. Plaintiff is apparently relying on Grievance no. 3968 to exhaust these claims. This grievance listed an incident date of November 23, 2009. Treatment notes reflect that plaintiff did not interact with Dr. Crompton on that date. Rather, on that date plaintiff saw NP Eipperle and discussed the discontinuation of the Neurontin which occurred on November 4, 2009. *See* Treatment Note (docket no. 178-1 at p. ID# 1716). While Grievance no. 3968 was resolved, questions of fact exist as to whether the grievance addressed Dr. Crompton's actions on November 4 and 20, 2009. Accordingly, defendants' motion for summary judgment should be denied with respect to the exhaustion of grievance nos. 3968 and 6005.

**3. Grievance no. 14**

Defendants contend that plaintiff did not properly exhaust this grievance because he failed to identify the staff and he did not attempt to resolve the grievance before filing. *See* Defendants' Brief at p. ID# 1291. As discussed, the MDOC did not reject the grievance on procedural grounds but addressed the merits of plaintiff's claims. For this reason, the Court should address the merits of the grievance. *See Reed-Bey*, 603 F.3d at 325. Finally, the record reflects that plaintiff exhausted this grievance through Step III. *See* Step III response (docket no. 1-20 at p. ID# 69). Accordingly, defendants' motion for summary judgment should be denied with respect to the exhaustion of grievance no. 14.

**IV. Eighth Amendment claims**

**A. Legal standard**

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, which constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that

prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. The conduct for which Eighth Amendment liability attaches must be more than negligence, "it must demonstrate deliberateness tantamount to an intent to punish." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (internal citation omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

**B. Discussion**

**1. Dr. Crompton**

On appeal, the Sixth Circuit has determined that a genuine issue of material fact exists on two Eighth Amendment claims against Dr. Crompton: (1) whether the doctor discontinued the Neurontin based upon a request that plaintiff made to a prison nurse on November 4, 2009; and (2) whether the doctor disregarded plaintiff's request for Neurontin on November 20, 2009. *Braddock*, No. 12-1354, slip op. at pp. 2-3. The Sixth Circuit further found that "[b]ecause a reasonable jury could find that [Dr.] Crompton disregarded a risk of serious harm when he failed to reinstate

Braddock's Neurontin prescription despite knowing that Braddock was in severe pain, summary judgment was not appropriate." *Id.* at p. 3.

Defendants take issue with the Sixth Circuit's determination that Dr. Crompton's actions could amount to deliberate indifference, contending that "[f]ailure to prescribe certain medications, even Neurontin, does not demonstrate deliberate indifference." Defendants' Brief at p. ID# 1283. Defendants also note that the Sixth Circuit's decision is contrary to a previous decision which found that a doctor is not deliberately indifferent for failing to provide a particular medication. *Id. citing Mabry v. Antonini*, 289 Fed. Appx. 895, 902 (6th Cir. 2008) (citing *Estelle*, 429 U.S. 97, for the proposition that a prisoner's complaint that a doctor "did not order specific tests, or provide specific medications, treatment, or dosages . . . does not state a constitutional claim of deliberate indifference as to serious medical needs"). *See also, Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) ("[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law") (quoting *Westlake v. Lucas*, 537 F.2d 857, 86, n. 5 (6th Cir. 1976).

Nevertheless, this Court is bound to resolve this case on remand as directed by the Sixth Circuit, which determined that plaintiff alleged two Eighth Amendment claims against Dr. Crompton which arose on November 4, 2009 and November 20, 2009 and that genuine issues of material fact exist with respect to plaintiff's claims. *See Braddock*, No. 12-1354, slip op. at p. 4 (remanding this case "for further proceedings in accordance with this opinion"). "Pursuant to the mandate rule, lower courts must adhere to the commands of a superior court." *Brunet v. City of Columbus, Ohio*, 58 F.3d 251, 254 (6th Cir. 1995) (internal quotation marks omitted).

> [U]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal. The trial court must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.

*United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir.1994) (internal quotation marks omitted). The Sixth Circuit has determined that summary judgment was not appropriate because a reasonable jury could find that Dr. Crompton disregarded a risk of serious harm when he failed to reinstate plaintiff's Neurontin prescription despite knowing that plaintiff was in severe pain. *See Braddock*, No. 12-1354, slip op. at pp. 2-3. This Court is bound by that determination on remand. *See Brunet*, 58 F.3d at 254; *Moored*, 38 F.3d at 1421. Accordingly, Dr. Crompton's motion for summary judgment should be denied.

**2. NP Eipperle**

NP Eipperle contends that she is entitled to summary judgment for two reasons. First, "she may have been confused over her ability to reinstate medication from the [prison's] Pain Management Committee." Defendants' Brief at p. ID# 1286. In this regard, NP Eipperle testified that she did not believe she had authority to give plaintiff Neurontin in December 2009 because the order for that medication expired in October 2009. Marilyn Eipperle Dep. (docket no. 176-3 at p. ID# 1314). Second, NP Eipperle stated that she provided plaintiff with Tegretol, "an alternative medication which was similar and appropriate." Defendants' Brief at p. ID# 1286. In support of this assertion regarding the use of Tegretol as a substitute for Neurontin, defendants cite the 41-page report from pain management expert Herbert Malinoff, M.D. and Dr. Crompton's opinion that "[i]n my medical judgment, Tegretol was an acceptable and effective alternative pain medication for the Neurontin." *See* Dr. Malinoff Report (docket no. 176-8); Robert Crompton Aff. at ¶ 10 (docket no.

68-2 at p. ID# 380). Even if NP Eipperle believed that she could not prescribe plaintiff Neurontin, the Sixth Circuit has rejected the proposition that Tegretol was an alternative to Neurontin in this case. Viewing the evidence in the light most favorable to the non-moving party (plaintiff), genuine issues of material fact exist with respect to whether NP Eipperle was deliberately indifferent to plaintiff's serious medical needs. Accordingly, NP Eipperle's motion for summary judgment should be denied.

## V. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (docket no. 176) be **DENIED**.

Dated: August 20, 2015

/s/ Ray Kent
RAY KENT
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).